## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v

JOHN DAWOOD DALALY,

        Defendant.

Case No.: 23-00040
Honorable Jane M. Beckering

_____/

CHRISTOPHER M. O'CONNOR
Assistant United States Attorney
Deputy Criminal Chief
330 Ionia Ave., NW
Grand Rapids, MI 49503
P: (616) 808-2019
E: christopher.oconnor@usdoj.gov

CLAY STIFFLER
Assistant United States Attorney
330 Ionia Ave., NW
Grand Rapids, MI 49503
P: (616) 808-2132
E: clay.stiffler@usdoj.gov

RAYMOND A. CASSAR (P36875)
Attorney for Defendant
30445 Northwestern Hwy., Ste. 220
Farmington Hills, MI 48334
P: (248) 855-0911; F: (248) 855-9523
E: ray@crimlawattorney.com

DANIEL J. MCGLYNN (P47678)
Attorney for Defendant
101 W. Long Lake Rd.
Bloomfield Hills, MI 48304
P: (248) 649-3554
E: dmcglynn@mcglynnassoc.com
_____/

## SENTENCING MEMORANDUM AND BRIEF IN SUPPORT OF REQUEST FOR DOWNWARD DEPARTURE AND/OR VARIANCE ON BEHALF OF DEFENDANT JOHN DALALY

Submitted By:
RAYMOND A. CASSAR (P36875)
Attorney for Defendant John Dawood Dalaly

4

## I.    THE NATURE OF THE OFFENSE AND PENALTY

The Defendant, JOHN DAWOOD DALALY, is before this Honorable Court for Sentencing after having pled guilty to Count 2 of the Felony Information. [PageID.27] Count 2 charged Payment of a Bribe, in violation of 18 U.S.C.§666(a)(2) and 2.  For Count 2, the maximum penalty is a $250,000 fine, and/or up to 10 years in prison; 3 years of supervised release; and a mandatory special assessment of $100. [PageID.27] The probation department has calculated guideline range in this case is 37 to 46 months. [PageID.533] However, defense counsel disputes the guideline range scoring and believes the correct guideline range is 24 to 30 months.

## II.    FACTS

John Dalaly was interested in obtaining a medical marijuana license for a company he formed. The company was called Pharmaco. The application for a license required demonstrating extensive financial assets. Mr. Dalaly sought investors from Canada that had the financial resources to back Pharmaco.

Rick Johnson was a lobbyist who was appointed by Governor Snyder to become the chairperson of the Michigan Medical Marijuana Licensing Board, commonly referred to as the MMLB. This board consisted of 5 appointed members. Under MCL 333.27302, the MMLB was in charge of granting or

5

denying applications for State licenses. The statute required a minimum of 3 votes to support a final determination of applications for licensing.

The license application was complicated and required Mr. Dalaly to contact Michigan's Licensing and Regulatory Affairs (LARA) for guidance on filling out the lengthy application. Mr. Dalaly claims that back in 2017, there was a lot of confusion about the medical marijuana application process since it was, in fact, new legislation. Most of the people he contacted at LARA were not able to answer Mr. Dalaly's questions about the application.

Rick Johnson was appointed as chairperson of the MMLB in May of 2017, Mike Callton introduced Mr. Dalaly to Rick Johnson over dinner. Mr. Dalaly asked Mr. Johnson who he could go to with the many questions he had about the application process because they were having difficulties with LARA. Mr. Johnson told Mr. Dalaly to contact his wife, Janice, and she would act as a consultant. Mr. Dalaly asked Mr. Johnson if this was legal and Mr. Johnson replied, "yes, she has her own consulting company." Mr. Dalaly asked Mr. Johnson how much to hire his wife, and Mr. Johnson responded "$4,000 per month."

Pharmaco entered into a financial arrangement with Janice Johnson to act as a consultant regarding the medical marijuana license. Pharmaco paid Janice Johnson $4,000 per month, over several months, to assist with answering questions about the application process. Mr. Dalaly would ask Janice questions about the

application, and she would get back to him with answers that came from Rick Johnson. Mr. Dalaly realized that the payments to Johnson's wife, Janice, were improper and clearly a conflict of interest since Rick Johnson was the chairperson. Pharmaco, was eventually granted a medical marijuana license.

Mr. Dalaly has accepted responsibility to the offense of Payment of a Bribe, waived Indictment, and timely pled guilty to Count 2 of the Felony Information.

## III.    DISPUTE OVER THE GUIDELINE SCORE

Defense counsel objects to the four-level increase citing USSG § 2C1.1(b)(3). This guideline enhancement specifically refers to any public official in a high-level decision making or sensitive position. Defendant Johnson was the chairperson of the Michigan Medical Marijuana Licensing Board (MMLB). However, Medical Marihuana Facilities Licensing Act, 281 of 2016, Section 333.27302(j) states:

> Three members of the board constitute a quorum, including when making determinations on an application for a license. **Three votes are required in support of final determinations of the board on applications for licenses and all other licensing determinations**, except that 4 votes are required in support of a determination to suspend or revoke a license. (Emphasis added)

The Board consisted of 5 Board members and to approve an application, 3 of the 5 members had to vote in favor of an application. Defendant Johnson only held one vote. The position as chairperson did not give him individual authority to grant or deny any applicant a license. The Board itself required a majority vote.

7

The fact that Defendant Johnson is a chairperson does not mean **he** had the "direct authority" to make decisions for, or on behalf of, the Board. Defendant Johnson did not control the Board's decisions.

The Application Note of Subsection (b)(3) states,

> (A)Definition – "High-level decision-making or sensitive position" **means** a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process.  (Emphasis added)

While the probation department opines that Defendant Johnson was in a sensitive position because he had access to non-public information, he still did not have the direct authority to make decisions for, or on behalf of, the MMLB Board. It required a three-member vote, and there is nothing in the discovery materials that indicate Defendant Johnson influenced the Board's decision.

The Court is obligated to follow the clear and concise definition in the sentencing guideline application note. This would preclude a four-level enhancement, which would make the total offense level 17.

Defense counsel also objects to the total amount of the bribe payments. The actual amount of the bribe payments should be $48,000. Mr. Dalaly states Defendant Johnson told him he needed money because he was losing his farm and Mr. Dalaly loaned him $20,000. Mr. Dalaly provided the government with a document showing this $20,000 was intended as a loan. More importantly, in

8

Paragraph 101, Defendant Johnson admits the $20,000 wire transfer in "July 2018 was a loan from Mr. Dalaly that he intended to repay." However, defense counsel concedes that the $20,000 reduction in the total amount of the bribe would not change the Guideline score.

Based on the above objections, defense counsel believes that the total offense level should be 17, resulting in an appropriate guideline range of 24 to 30 months.

## IV.     A DOWNWARD DEPARTURE FROM THE SENTENCING GUIDELINE RANGE IS WARRANTED UNDER 18 U.S.C. § 3553

The statutory authority for sentencing guideline departure is found at 18 U.S.C. § 3553 (b). The United States Sentencing Guideline Manual also authorizes departures under § 5K2.0. Pursuant to the holding of *United States v. Booker*, 125 S. Ct. 738, 750-751, 756 (2005), the Sentencing Guidelines are advisory in nature. The lack of mandatory guideline sentences now allows the Court flexibility to sufficiently account for the unique circumstances of each case. The United States Supreme Court expanded the Courts' authority to deviate from the sentencing guidelines in the case of *Gall v. United States*, 128 S. Ct. 586 at 602 (2007):

> But the guidelines are not mandatory, and thus the range of choice dictated by the facts of the case is significantly broadened. Moreover, the Guidelines are only one of the factors to consider when imposing sentence, and 3553 (a)(3) directs the judge to consider sentences **other than imprisonment**. (Emphasis added)

9

The Court in *Gall* relied heavily on the 18 U.S.C. § 3553, which directs Courts to the appropriate factors to consider in crafting a sentence:

> FN6. Section 3553(a) lists seven factors that a sentencing court must consider. The first factor is a broad command to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553 (a)(1). The second factor requires the consideration of the general purposes of sentencing, including: '
> "the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical are, or other correctional treatment in the most effective manner." §3553(a)(2).
>
> The third factor pertains to the "kinds of sentences available," § 3553(a)(3); the fourth to the Sentencing Guidelines; the fifth to any relevant policy statement issued by the Sentencing Commission; the sixth to "the need to avoid unwarranted sentence disparities." § 3553(a)(6); and the seventh to "the need to provide restitution to any victim," § 3553(a)(7). Preceding this list is a general directive to **"impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing** described in the second factor. § 3553(a) …*Gall*, 128 S.Ct. at 597. (Emphasis added).

It is important to note that §3553 requires courts to take all of these factors into consideration prior to crafting a sentence. Furthermore, "the Guidelines are only one of the factors to consider when imposing sentence, and §3553(a)(3)

10

directs the judge to consider sentence **other than imprisonment**." *Gall*, 128 S.Ct. at 602. (Emphasis added).

There are various reasons a court can depart downward from the guidelines, specifically, the commentary and application note 3 that follows, §5K2.20 states:

> a. Other Circumstances to Consider – In determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense, and (E) efforts to mitigate the effects of the offense.

## V.    MOTIVATION FOR COMMITTING THE OFFENSE

While on its surface, it appears that the motivation for committing the offense was simply to obtain a medical marijuana license for Pharmaco. However, the original motivation was to get help in answering complicated questions on the application. This was new legislation that LARA did not have the staff, nor the ability to answer the questions about the application. Unfortunately for John Dalaly, what began as an inquiry to Rick Johnson as to how do we get our questions answered, quickly turned into a payment scheme where John was to pay Johnson's wife Janice monthly and she would take John's questions, talk to Mr. Johnson, and get directions.

This was not some well-planned out bribery scheme and as such, the Court should take this into consideration when forming a fair and just punishment.

11

## VI.   PERSONAL HISTORY

In 1963, John Dalaly was 11 years old when he and his family migrated to the United States from Baghdad, Iraq. His parents and 6 children lived in Detroit in a two-bedroom flat. His father worked at his uncle's market with John's older siblings to make ends meet. John was brought up in a strict Catholic home where family and faith meant everything. John's twin brother died at four months old.

John watched his father and siblings work 15-hour days. They took the bus back and forth to work. John and his younger brother attended grade school and did odd jobs on the weekends, like shoveling snow and cutting grass, to help the family get by.

John's family upbringing was based on loyalty, honesty, and reputation. John's father always said, "your reputation is all you have." They lived a very simple, humble life growing up. John and his family ate the same food for lunch and dinner. On the weekends when they were not working, they would visit family members and sit for hours talking about old times and exchanging stories.

In 1966, the Dalaly family moved to Southfield, Michigan, to a three-bedroom home. Eight people residing in a three-bedroom house was challenging, but they made it work. John's father bought a small neighborhood food store in Detroit, where John's father and his siblings worked seven days a week. John and

his youngest brother would help on the weekends when they were not in school. The business was barely making a living for the family, but it put food on the table.

John's mother and father were caring and loving parents. They put their children before themselves. While they lived very simple lives, John's parents wanted to make sure to instill the most important values in their children: "family means everything, work hard in everything that you do, be leaders and not followers, and have good friends."

John never experienced family vacations, but always looked forward to the summertime picnics with his family. John's parents would try to make Christmas special for him and his siblings by giving them each a few dollars to have and a new outfit. John would not change his childhood for anything – it truly made him put his faith and family first.

John enjoyed school and enrolled in sports. He attended Southfield Lathrup High School and graduated in 1972. He would be the only one in his family to graduate high school, which was a huge accomplishment for John and his family.

During John's high school years, he held several jobs to help his family with the cost of raising 6 children. His father eventually had to shut down the small Detroit market.

## VII.   FAMILY SUPPORT

In 1979, John married the love of his life, Vivian. They have been married 45 years. They have three daughters, Dina, Janan, and Katrina, and 8 grandchildren. John's grandchildren range in age from 15 months to 13 years old, whom he adores. John texts his grandchildren every morning to encourage them and give them love and positive inspiration for their day. Recently, John had to sit down with his 13-year-old granddaughter who confronted him about what happened because she read about him on the internet. John responded, "Papa did business with a bad guy." John lives with regret and punishment every day when he sees what this has done to his family.

John's family is the air he breathes. Like John's parents, John has instilled great family values in his own family. John has a strong passion for food and gathering with his family. Every week, his daughters, sons-in-law, and grandchildren come over for a meal. John enjoys cooking and learning different techniques. John gives all the credit to his wife and daughters, who are excellent cooks. They make all his favorite dishes that his mother and aunts used to make. John enjoys trying different foods from all over the world where he has traveled. In his culture, they show love and giving with food. Food is the center of their gatherings.

14

John's wife and three daughters wrote character letters on his behalf. *(See Exhibits A, B)*. John's wife, Vivian, wrote,

> "I have witnessed many qualities in my husband that I can't say other men possess. I can tell you that what he did is totally out of character. He has always been a caregiver at heart and hates to see anyone around him suffer… Now because of a terrible choice, he is the one suffering gravely. Not a minute of his day passes without dwelling on his actions." *(See Exhibit A)*

John's sister, Norah Yeldo, is his best friend whom he leans on to for support and guidance. John talks to Norah multiple times per day.

Norah wrote,

> "We all stumble at some point in our lives. John acknowledges and deeply regrets the mistake he made. He has shared with me the anguish it has caused him, even going so far as to say he'd give everything away, tarnishing his name, if it meant rectifying this error." *(See Exhibit C)*

## VIII. FAITH

John's father was a deacon at Mother of God Catholic Church. John would accompany him at mass every week. John continues to carry on his faith as his faith in God always comes first. John believes that God makes better people of us during our darkest days.

John prays the rosary daily. There is not a day or night that goes by when he does not spend time in his religious grotto at his home. John's grotto is a beautiful sacred space that he built to the The Blessed Mother, who is the cornerstone of his

Law Offices of Raymond A. Cassar, PLC. 30445 Northwestern Highway, Suite 220, Farmington Hills, MI 48334  248.855.0911

catholic faith. He looks forward to his daily ritual where he goes to pray, give gratitude, and reflect on his day.

John is a Eucharistic Minister at Beaumont Health System, Henry Ford Hospital, and his church, Prince of Peace Catholic Church. Reverend Ronald Jozwiak, the pastor at Prince of Peace Catholic Church wrote,

> "As this is the first time Mr. Dalaly has been involved in something illegal and knowing the character of this man, a lesson I learned in my Canon Law training could be applied here: justice is tempered by mercy and mercy is tempered by justice. Justice must be served but leniency in sentencing can take into account his many years of faithful service and honest business practices." (*See Exhibit D*)

John volunteers 3-5 hours a week passing out the Eucharist at Corwell Health (formerly known as Beaumont Hospital) to patients. This brings much joy to John as he often sees very sick people in the hospital with no family or friends. He will make it a point to spend as much time as he can with the lonely patients. He makes it a point to leave every patient in better spirits than before he came in.

Reverend Deborah R. Damore wrote a character letter on behalf of John and in her letter, she states,

> "One patient said, "it made me feel less alone when he brought me communion." (*See Exhibit E*)

## IX.  CHARITABLE WORKS

Helping others has always been a huge part of John's life. He contributes a great deal to the community by helping others in times of need. During the COVID-

16

19 pandemic, John was a state vendor for masks, and had three mobile covid testing units to provide testing and vaccines to schools, churches, and to Wayne County. John has donated turkeys and canned goods to the church for Thanksgiving, clothing, and school/baby supplies to families during the holiday season, and weekly monetary donations to the church to help them spread the good word. John stated, "I will always do my best to help others and give them the shirt off my back before they ask. Seeing someone smile during their time of need is very important to me." The whole meaning to life is helping the less fortunate. John has helped many people during his life, and he has made many friends along the way. (*See Exhibits F, G, H, I, J, K, L, M, N*)

John was not the oldest of his siblings, but he took on great responsibility to help his family. John personally took care of his mom, brother, and sister when they got sick. He continued to do so up until they passed away. He paid all their hospital and funeral bills. He is the caregiver for his entire family. He is driven by faith, not by money. He continues to be there for them as his sister, Norah, just started cancer treatment and his brother, Dhafir suffers with bipolar disorder.

John's charity extends beyond his family. He has helped pay for funeral expenses of strangers. He has helped many church members who have fallen on hard times and gets involved with various children's charities. He does so anonymously, as he does not seek the praise of others. He attends Catholic silent

17

retreats which gives him time to reflect on his life. It has opened many doors to helping others in need.

## X.    EMPLOYMENT HISTORY

John is no stranger to hard work. He began working when he was a young teenager, doing odd jobs and helping out at his family-owned store. John has always been determined, having a high work ethic. John became self-employed in 1983. John's true passion lies within the healthcare field and given his successful entrepreneurial background, he has done a lot of good in the world, both domestically and internationally.

John has several entrepreneurial accomplishments over many decades. To name a few, he coordinated strategic business alliances in the United States, Middle East and Far East. He managed 47 hospitals in build-operate-transfer (BOT), operations and maintenance (OAM), management services, technical and technology assistance, training and education programs, and medical and clinical services. John organized over 3,000 workers throughout the Middle East resulting in the creation of state-of-the-art medical schools and medical facilities. Further, John consulted the with Kingdom of Saudi Arabia's Ministry of Health in negotiating a hospital contract for a local healthcare company.

18

Over the years, with a lot of hard work, John was very successful and at times not so successful. Success and money were not his goals in life. It just came with hard work.

## XI.    COOPERATION WITH THE GOVERNMENT

John said, "you must learn to understand why you made a mistake or experience failure and take corrective action." Well, he did just that. Since last summer, John Dalaly worked hard to mitigate the effects of the offense by proffering with the government five separate times between October 2022 and as recent as August 2023. [PageID.515] John provided numerous documents, photos, and emails over the period of five different proffers. John answered questions and provided helpful information to the government.

It is anticipated that the government will file a motion for downward departure or sentence reduction related to substantial assistance, pursuant to USSG 5K1.1. [PageID.533] Irrespective of whether the government files a 5K1.1 motion, this Court retains the discretion to take into account a defendant's cooperation as a 3553(a) mitigating factor. *United States v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009). John was also the first to waive indictment, accept responsibility, and plead guilty.

## XII.   PRIOR RECORD

Mr. Dalaly is 71 years old. He has no prior criminal history, nor has he ever been arrested before. [PageID.527] Age and lack of a prior criminal history is a significant factor the Court must consider. He has spent his entire life leading a law-abiding productive life and should not be judged solely based on the crime he committed.

## XIII. AGE AND ABERRANT BEHAVIOR

Aberrant is defined as "unusual or straying from a defined path." The bribery crime John committed is clearly aberrant behavior especially when you consider his age. John's defined path was surrounded by hard work, faith, and family. This writer spent many hours talking to John about why he committed this crime since it is such a departure from his life trajectory. John insists that he never had any plans to bribe anyone, but it happened, and he accepts responsibility for his actions. His regret and remorse are apparent to everyone, especially his family. Since last summer, he has been treated for depression and anxiety. Unable to sleep through the night because of shame, John has been prescribed Xanax and Sertraline and is seeing a counselor at Rochester Psychology. (*See Exhibit O*)

## XIV.  MEDICAL

Given John's advanced age, John suffers from medical conditions for which he is being treated for. John has a history of coronary disease with prior stenting,

Law Offices of Raymond A. Cassar, P.L.C. 30445 Northwestern Highway, Suite 220, Farmington Hills, MI 48334  248.855.0911

hypertension, hyperlipidemia, GERD, and diverticulosis. (*See Exhibit P*). John also suffers from paroxysmal positional vertigo. (*See Exhibit Q*). The Court can consider age and medical conditions as a factor in the ultimate sentence.

## XV.   SEPARATING THE OFFENSE FROM THE OFFENDER

It is important for a sentencing judge to understand the human being behind the police report, charging documents, and every one-sided piece of paper in the court file. The Supreme Court has repeatedly made clear that sentencing courts may not be cabined by policy statements discouraging consideration of factors that are relevant under Section 3553(a). *Gall v. United States*, 552 U.S. 38, 51, 53-60 (2007). The Guidelines are not only not mandatory, they are also not to be presumed reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009). Those numbers are often not based on any empirical evidence or data, and they often yield results totally untethered to the goals of sentencing. Also, where the guidelines conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines. See *United States v Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since §3553(a) requires sentence to be no greater than necessary to meet the four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates the statute and is reversible, **even if within the guideline range**) (*emphasis added*).

21

## CONCLUSION

John Dalaly is proof that good men can make bad decisions. The Court must make a decision based on all of the factors and circumstances of this case. What is the appropriate punishment that is sufficient but not greater than necessary?

John Dalaly led a very good and productive life. It is important to keep in mind that John did not have some well-organized plan to bribe Rick Johnson. John concedes that paying Johnson's wife for so-called consulting fees had "red flags" all over it. John knew that it was wrong even if Rick Johnson said it was not illegal because she was a consultant. John accepted responsibility for his actions. Whether his extensive cooperation with the government proves to be valuable is not as important as John's desire to try and make things right. If he goes to prison, other inmates may choose to harass him about his cooperation. But John made it clear to me and to his family, "I want to do the right thing."

John told this writer,

> "I made not just an error, or a mistake and the lesson learned and the shame, hurt, and damage to my once stellar reputation in the community and my church is done. But what I did to my family is something you just cannot put into words. I was simply not raised this way."

True remorse is a powerful indicator of how we are going to live the rest of our life. John says, "I will make it right."

22

WHEREFORE, it is respectfully requested that this Honorable Court take into consideration all the factors presented in this Brief in Support of Defendant's Motion for Downward Departure and/or Variance and impose a sentence that is fair and just based on the unique circumstances of this case.

Respectfully Submitted,

s/    Raymond A. Cassar
Law Office of Raymond A. Cassar, PLC
30445 Northwestern Hwy. Ste. 220
Farmington Hills, MI 48334
(248) 855-0911; Fax (248) 855-9523
Ray@crimlawattorney.com
P36875

Date: August 31, 2023

23

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2023, I electronically filed Defendant's combined Motion for Downward Departure and/or Variance and Sentencing Memorandum and Brief in Support of Request for Downward Departure and/or Variance with the Clerk of the Court using the ECF system which will send notification of such filing to all parties.

> s/ Raymond A. Cassar
> Law Office of Raymond A. Cassar, PLC
> 30445 Northwestern Hwy. Ste. 220
> Farmington Hills, MI 48334
> (248) 855-0911; Fax (248) 855-9523
> Ray@crimlawattorney.com
> P36875

Date: August 31, 2023