UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

        Plaintiff,        No. 1:23-cr-40

vs.        Hon. Jane M. Beckering

JOHN DAWOOD DALALY,

        Defendant.

**BRIEF IN SUPPORT OF MOTION TO MODIFY TERM OF IMPRISONMENT**

Introduction

    John Dalaly has requested the Court to modify the term of imprisonment imposed under 18 U.S.C. § 3582(c)(1)(A) due to a serious medical condition developed in prison.  Mr. Dalaly developed a widespread and invasive infection around his spine.  Due to delays in getting medical treatment from the medical staff at his prison facility, the infection caused multiple abscesses around his spine, necessitating surgery to drain the abscesses and a spinal fusion to keep the spine from collapsing from the bone loss caused by the infection.  Mr. Dalaly will not recover to his pre-abscess condition and has significant impairment of ambulation and mobility, as well as cognitive decline.  His best chance for a rebound to a reasonable level of functioning will be to participate in intense inpatient and then outpatient multi-disciplinary rehabilitation.  He cannot get the necessary level of care within a prison setting, nor

can he provide self-care in a prison setting. He requests the Court to reduce sentence and order his compassionate release.

Facts

*Plea and Sentencing*

Mr. Dalaly was charged by Felony Information with Payment of a Bribe, contrary to 18 U.S.C. § 666(a)(2). The charge was related to his payment of approximately $68,000 in 25 installments over a 14-month period in 2018 to a public official in order to get a license to sell marijuana from the state of Michigan. Prosecution of Mr. Dalaly was part of a wider investigation into corruption of the Michigan marijuana licensing process. Mr. Dalaly cooperated early on with the government, proffered extensively, agreed to a Felony Information and was the first in the scheme to plead guilty.

The Court sentenced Mr. Dalaly on September 14, 2023. Sentencing, RE139, PageID1338-1404. The Court calculated the advisory guideline range to be 37-46 months imprisonment based on a total offense level of 21 and a criminal history category of I. The government moved for a two-level reduction in the guideline range under U.S.S.G. § 5K1.1 based on Mr. Dalaly's substantial assistance. *Id.* at 1365-1366. The Court granted that motion, which brought the guideline range to 30-37 months imprisonment.

The defense moved for a variance and/or age and health related departures from the guideline range. The Court disagreed that age and health were proper variance factors. *Id.* at 1394. However, it did find that because Mr. Dalaly had a

2

criminal history score of zero without any prior arrests or convictions that it would vary two levels downward to reflect the anticipated addition of U.S.S.C. § 4C1.1 to the guidelines. *Id.* at 1395. Thus, it varied to a guideline range of 24-30 months imprisonment.

Ultimately, the Court imposed a custodial term of 28 months imprisonment. The Court was concerned particularly about the need for the sentence to reflect the seriousness of the offense because in its view, public corruption is the most serious form of bribery because it erodes public trust in government. *Id.* at 1394. The Court weighed the seriousness of the offense against Mr. Dalaly's many positive attributes: no criminal history; loving, supportive and very stable family with a wife of 45 years, three daughters and eight grandchildren; his acceptance of responsibility including helping the government along with his genuine remorse and embarrassment; that he contributes to his community with good works; and, that he voluntarily sought professional help after the investigation commenced to deal with his problems. *Id.* at 1392-1393. The Court allowed Mr. Dalaly to self- surrender to serve sentence.

*Prison term*

Mr. Dalaly was designated to the men's minimum-security camp at USP Hazelton in Bruceton Mills, West Virginia. There are currently 157 inmates at the camp and 1,239 inmates at the USP.[1] Also on the same campus is FCI Hazelton which has 1,608 inmates at the FCI and 483 inmates at the Hazelton women's secure facility.[2] Thus, the total number of inmates at the Hazelton compound is

---

[1] https://www.bop.gov/locations/institutions/haz/
[2] https://www.bop.gov/locations/institutions/haf/

3

approximately 3,500.  There is **one** doctor assigned to Hazelton, i.e. one doctor tasked with servicing 3,500 inmates.  Hazelton has been in the news lately due to inmate deaths, concerns about serious misconduct on the part of staff and understaffing issues.[3]  The BOP, generally, is in the news due to staffing shortages, particularly medical staffing shortages.[4]

      Mr. Dalaly self-surrendered to Hazelton on November 30, 2023.  He has been a model inmate without any disciplinary infractions.  He is eligible for Earned Time Credits (ETC) under the First Step Act (FSA).  Exhibit A.  He is respected by the other inmates and staff.  He was the oldest inmate at the camp and people called him "Pops."  His focus has been to better himself for his ultimate release.  To that end, he has taken a number of classes: Talking to your DR; Threshold; Brain Health, The Power of Change; and National Parenting to name a few.  Exhibit B.  He also got a job working in the kitchen.  His duties are washing trays and serving food.

      He was asked by his counselor and the education department to teach classes to other inmates.  His first class was called "Release Plan Prior to Prison" and was a 4-week class with 15 students that helped other inmates recognize the value of planning for what's next.  The second class was called Dress for Success, which focused on job interviewing skills.  Dovetailing into Dress for Success, he also taught Resume Building, Job Application 101 and Job Scams 101.  Mr. Dalaly hosted a class called Coffee Hour, which was an open forum class to discuss miscellaneous topics.

---

[3] New report outlines deaths at Hazelton, other federal prisons (wboy.com); Two inmates dead at USP Hazelton (wdtv.com); Update on USP Hazelton: the country's 2nd deadliest prison (wdtv.com)
[4] DOJ watchdog finds major issues at a federal prison in Oregon : NPR

The classes were FSA classes and the students got certificates.  He also wrote a book while serving sentence called "The Dalaly Way," a book meant to inform others from his own experiences about accepting responsibility and preparing for success upon release from imprisonment.  The book is available on Amazon.[5]

The 157 inmates at the camp are separated into two separate living quarters, Unit 1 and Unit 2.  Each unit houses half of the inmates.  They live in a row of bunk beds in a large room that Mr. Dalaly describes as feeling like a bowling alley.  There is a chair and desk in between each set of bunk beds but there is zero privacy.  The bathroom is like a high school locker room with multiple stalls, sinks and showers.  The bathrooms are not very clean, and the showers have mold.  All inmates eat in the dining area at the same time, three times daily.  The inmates are required to make their beds, do their laundry and generally keep the living area somewhat clean.  Activities require the inmates to be mobile, but the camp is wheelchair accessible.

*Medical Emergency*

Mr. Dalaly entered prison at the age of 71.  Pre-existing medical conditions when he surrendered were: coronary artery disease with a stent in 2005; hypertension; hyperlipidemia; high stress level; GERD; and a history of diverticulosis.  However, functionally he was a relatively healthy, active and sharp 71-year-old when he began serving sentence.

---

[5] https://www.amazon.com/Dalaly-Way-Conquering-Crisis/dp/B0CT3H185H/ref=sr_1_1?crid=77HNW5SX3V0M&dib=eyJ2IjoiMSJ9.YjrlGCpEQU4dxOiylgTVNYX8jtaMdM3plFw1GJ2TjlxQZhkSaKrNIXXTSGC4NJ3yukGwnYCrTMYzg2cHEiSJXw.jr-2WU7ur31HNsCPJqM3esFfU-LrpNxKQwJACUC0Llc&dib_tag=se&keywords=the+dalaly&qid=1717165139&sprefix=the+dally%2Caps%2C130&sr=8-1

That all changed earlier this year. While Mr. Dalaly cannot pinpoint an acute injury, he began experiencing severe back pain in March 2024. His pleas to prison medical staff for assistance were met with instructions to take Tylenol or Advil. Exhibit D. The issues did not resolve despite his repeated complaints and requests for medical care. Mr. Dalaly felt worse and experienced intense pain that made him extremely uncomfortable when walking or sitting. He was moving around via wheelchair and even had to rely on other inmates to help him to the bathroom. He was unable to work because of an inability to function.

The first time he was seen by medical staff for the issue, according to medical records received, was April 19, 2024. Exhibit C, p. 27. He was seen by an RN and told the RN that he has been having severe back and shoulder pain for 35 days. He requested an x-ray, which was scheduled but completed on his lungs and chest, not his back and shoulder so it had to be rescheduled. He was "referred to commissary," i.e. take ibuprofen or acetaminophen.

He was seen again on April 22, 2024, this time by an APRN. Exhibit C, p. 23. According to medical records, he cried when describing his back pain. The APRN noted that he was taking the maximum daily doses of Tylenol and ibuprofen. The APRN ordered an x-ray of his back and shoulder, and also lab tests.

The next day, on April 23, 2024, Mr. Dalaly fell while in the shower because he was so weak and in so much pain. Exhibit C, p. 19. He was unable to get up on his own from the fall and other inmates had to help him. He was seen by medical staff

6

that day and went to medical services in a wheelchair. The encounter with medical was noted but there was no change in the plan for care.

Mr. Dalaly sought medical services again on April 25, 2024, again for severe back pain that had been going on for months. Exhibit C, p. 15. The only outcome of the visit was a note that an x-ray of his spine was ordered and that there would be a follow up appointment with a provider.

By May 4, 2024, Mr. Dalaly could not stand due to swelling in his feet and 10/10 back pain level that was not resolving. Exhibit C, p. 10. He was seen again by medical staff with the same outcome: take over the counter pain medications and a follow up with a provider would be scheduled. By this point, Mr. Dalaly could not perform even the simplest tasks at the camp and needed help getting to and from the bathroom, shower and cafeteria. He could not perform the required cleaning and bed making.

That follow up with the provider never occurred because Mr. Dalaly ended up being sent to the hospital on May 5, 2024. Though this is not contained in the medical record, we are told that on that date, other inmates went to Mr. Dalaly's counselor and begged the counselor to help Mr. Dalaly because they saw how much pain Mr. Dalaly was experiencing. The other inmates were having to carry him to the toilet and to shower. The inmates noticed his cognitive decline. One inmate sat by Mr. Dalaly's side for 24 hours between May 4 and 5 because he was so worried about Mr. Dalaly. Fortunately, his counselor took these pleas from the other inmates seriously,

7

arranged for Mr. Dalaly to see medical staff and medical staff sent him to an area hospital for evaluation. Exhibit C, p. 6.

Imaging at the hospital revealed multiple abscesses on Mr. Dalaly's spine, i.e. severe infection, and osteomyelitis, i.e. inflammation and swelling, of the spine. Exhibit E. The prison doctor saw Mr. Dalaly in the hospital but that was the first time he had seen Mr., Dalaly for this problem. Then, the prison doctor – the only one on the campus – left the prison for a family emergency. The prison health services department was left without a doctor for weeks.

Mr. Dalaly was transferred to the Charleston Area Medical Center (CAMC). He underwent spinal surgery on May 8, 2024. The surgery included draining the multiple abscesses and also, installing spinal fusion hardware, i.e. pins and screws, to keep his spine from collapsing. Exhibit E, F, G.

Mr. Dalaly is still in the hospital. He will have to remain in a hospital setting until mid-June to continue to receive IV antibiotics. Exhibit C, p. 2. After that, he will need to be on oral antibiotics for a year. Exhibit E. The intense antibiotic regime is to deal with the widespread and invasive spinal infection that caused the abscesses in the first instance, and also because Mr. Dalaly is at high risk for infection due to the spinal surgery and hardware installed. Exhibit E. His treating hospitalist, Sumit Karna, M.D., at CAMC says that it is important that he live in a hygienic environment to avoid any further infections, as any complications relating to his current spine infection may affect his ability to ambulate in the future. Exhibit E.

The treating hospitalist, Dr. Karna, reports that Mr. Dalaly's baseline physical activity has declined significantly as a result of the widespread infection and bone loss.  Exhibit E.  He will need extensive physical therapy.  Exhibit E.  Mr. Dalaly had to have a blood transfusion because of his debilitated state, and at this time can only walk about 100 feet with assistance before extreme pain and leg weakness prevent him from standing.  Exhibit F.  Physical therapists involved in treating Mr. Dalaly have recommended that he be placed in a skilled nursing facility with continued support for range of motion, strength training and ambulation support.  Exhibit F.

Two independent physicians have reviewed Mr. Dalaly's medical records. Steven N. Kalkanis, M.D. of Henry Ford Medical Center (CV attached with Exhibit F) says that the delay in diagnosing the infection allowed for the infection to disseminate widely, which necessitated the removal of bone during the surgery and the subsequent spinal fusion.  The infection and infusion led Dr. Kalakanis to the conclusion that Mr. Dalaly's prognosis is quite poor.  Exhibit F.  Dr. Kalkanis opines that Mr. Dalaly will likely require significant assistance with ambulation for the rest of his life and will require assistance with basic activities of daily living like grooming, bathing and eating.  In Dr. Kalkanis's opinion, Mr. Dalaly's serious physical impairment from all of this is compounded by cognitive decline and chronic pain rendering him functionally incapacitated.  Exhibit F.  It is also Dr. Kalkanis's opinion that Mr. Dalaly will not be able to achieve pre-abscess recovery to baseline and that his condition will continue to impair his ability to provide self-care.  Exhibit F.

9

But, that said, Dr. Kalkanis states that the single most important intervention to address his mobility and ongoing recovery is to have intense, daily specialized care in the form of long term physical and occupational therapy, physical medical and rehabilitation services, and cognitive memory and behavioral therapy for at least the next year and likely beyond. Exhibit F.

Dr. Andrew Harb, a physical medicine and rehabilitation doctor (CV attached with Exhibit G) similarly opines that Mr. Dalaly is suffering from a serious physical and medical condition that will greatly impact his function in self-care, mobility and ambulation. Exhibit G. According to Dr. Harb, Mr. Dalaly needs extensive rehabilitation in a multidisciplinary setting that includes physical therapists, occupational therapists, rehabilitation nurses and neuropsychologists. Dr. Harb also opines that inpatient rehab with a specialized Spinal Cord Injury unit is critical. Exhibit G. And that Mr. Dalaly will likely require extensive, long-term outpatient therapy to continue his recovery process. Exhibit G.

A medical consulting firm also reviewed Mr. Dalaly's records. Abdallah Cheema, M.D., Chief Medical Officer of Community First Health Consulting opines similarly to Dr. Karna, Dr. Kalkanis and Dr. Harb: the delay in diagnosis exacerbated the problem; the medical problem is serious and complicated; meticulous adherence to the standard of care regarding extensive rehabilitation is required for an optimal outcome; and, neglecting treatment can cause further deterioration of his physical condition and severe complications. Exhibit K.

*Attempts at Administrative Relief*

On May 7, 2024, Mr. Dalaly made a request for compassionate release with the warden of his facility. It was denied by the warden on May 15, 2024. Exhibit H. Mr. Dalaly was informed of the denial on May 21, 2024, when his prison counselor visited him at the hospital. Upon information and belief, this was the last time Mr. Dalaly had in person contact with BOP staff until June 6, 2024. Counsel was sent the denial statement on May 22, 2024. The denial contained no notice to Mr. Dalaly of any appeal rights. Exhibit H. The denial noted that Mr. Dalaly has not yet served 50% of his sentence. We would note that with good time credit and earned time credits, Mr. Dalaly will have served 50% of his sentence by August 2024.

Mr. Dalaly was scheduled to be discharged from CAMC to Preston Memorial Hospital for completion of the IV antibiotics on May 24, 2024. But that transfer was aborted due to a "security breach." The so-called security breach was that Mr. Dalaly's daughter Dina, after being informed by BOP staff that Mr. Dalaly would be transferred to Preston Memorial, called Preston Memorial to inquire about its facilities. This was deemed a security breach and the BOP cut off all communication between Mr. Dalaly and his family, as well as cancelling the transfer to Preston. Mr. Dalaly remained at CAMC, lying in a hospital bed without access to the intense rehabilitative therapies recommended by the doctors until his June 6, 2024 transfer to a different hospital – we do not know where he is or what services he is being offered, only that he is no longer at CAMC.

Though given no appeal rights from the warden's denial of compassionate release, counsel sent a request for administrative review of the warden's decision denying compassionate release to the Regional Director of the BOP on June 3, 2024. Exhibit I. Per BOP rules, appeals to the Regional Director must be submitted within 20 days of the date the warden signed the response. 28 C.F.R. § 542.15. Counsel received an email on June 4, 2024 stating that the Regional Director would not accept an appeal not submitted by the inmate, citing 28 C.F.R. § 542.16(a). Exhibit J. However, the Regional Director did not give Mr. Dalaly any time to correct the defect and resubmit the appeal nor acknowledge that it had discretion to accept the filing from counsel due to his hospitalization and complete lack of access to resources which make it impossible for him to submit the request himself. 28 C.F.R. § 542.17(b). On Mr. Dalaly's behalf, counsel has requested the warden's office have Mr, Dalaly sign the required appeal forms. On June 6, 2024, the warden's office responded that it would attempt to have this done. Exhibit J. An appeal of the rejection of the appeal to the Regional Director must be made to the General Counsel's office within 30 days of the rejection of the appeal by the Regional Director. 28 C.F.R. § 542.17(c).

This filing is being made after 30 days have elapsed from when Mr. Dalaly first submitted his compassionate release request to the warden on May 7, 2024.

Law

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a term of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been

12

imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Known as the "compassionate release" provisions, eligibility for relief turns on whether the defendant can demonstrate that "extraordinary and compelling reasons" warrant a sentence reduction, that a reduction in sentence is consistent with the policy statements of the Sentencing Commission as well as the sentencing factors under § 3553(a), and that he has exhausted administrative remedies.

The exhaustion requirement means that prisoners must fully exhaust all administrative rights or wait for 30 days after the warden's receipt of their request, whichever is earlier. *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) (exhaustion not satisfied when compassionate release motion filed 10 days after request to warden).

Effective November 1, 2023, the Sentencing Commission issued clarifying and expansive policy statements regarding compassionate release by amendment of U.S.S.G. § 1B1.13. It provides only that "extraordinary and compelling reasons" may include "certain medical circumstances of the defendant, age, family circumstances, abuse in prison, other circumstances similar in gravity to the

13

aforementioned, and an unusually long sentence imposed before a change in sentencing law." *United States v. Nash*, 2024  U.S. App. LEXIS 10519, *6-7 (6th Cir. Apr. 30, 2024 (unpublished opinion). In pertinent part, § 1B1.13 states:

> **(a) In General.**  Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to *18 U.S.C. § 3582(c)(1)(A)*, the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in *18 U.S.C. § 3553(a)*, to the extent that they are applicable, the court determines that—
> **(1) (A)**  extraordinary and compelling reasons warrant the reduction…
> **(2)**  the defendant is not a danger to the safety of any other person or to the community, as provided in *18 U.S.C. § 3142(g)*; and
> **(3)**  the reduction is consistent with this policy statement.
>
> **(b) Extraordinary and compelling reasons.**  Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
> **(1)**  Medical circumstances of the defendant.
> **(B)**  The defendant is—
> **(i)**  suffering from a serious physical or medical condition,
> **(ii)**  suffering from a serious functional or cognitive impairment, or
> **(iii)**  experiencing deteriorating physical or mental health because of the aging process,
> **(iv)**  that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> **(C)**  The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

<u>Argument</u>

In this case the defendant is suffering from a serious physical or medical condition and/or suffering from a serious functional or cognitive impairment that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to

14

recover during his term of imprisonment. The defendant is also suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death. These criteria are established through the letters of the doctors. Exhibit E, F, G and N and extraordinary and compelling reasons under § 1B1.13(b)(1)(B) and (C) are met. He cannot provide self-care in a BOP setting and the BOP cannot provide him the care and rehabilitation he requires.

Mr. Dalaly's serious medical condition has substantially diminished his ability to provide self-care in the prison setting. Mr. Dalaly's prognosis is poor. He will likely require significant assistance with ambulation for the rest of his life. Mr. Dalaly will require assistance with basic activities of daily living like grooming, bathing and eating. His serious physical impairment from all of this is compounded by cognitive decline and chronic pain rendering him functionally incapacitated. Mr. Dalaly will not be able to achieve recovery to baseline and his condition will continue to impair his ability to provide self-care, as well as his mobility and ambulation.

Moreover, he needs significant long-term rehabilitation without which he has no chance of recovering to a reasonable degree. Mr. Dalaly needs extensive rehabilitation in a multidisciplinary setting that includes physical therapists, occupational therapists, rehabilitation nurses, cognitive memory and behavioral therapy and neuropsychologists. These services, in addition to the need for oral antibiotics and a sterile environment to avoid reinfection, will be needed for at least

the next year and likely beyond. We have no indication or evidence that the BOP has the medical professionals or is equipped to offer the necessary rehabilitation services.

He has exhausted administrative remedies. We believe his administrative remedies were exhausted when the warden denied his request for release on May 15, 2024, and did not give him any appeal rights. Nevertheless, we did our best to continue to seek administrative remedies given that we have no access to Mr. Dalaly and he has no access to any resources. The response from the BOP shows that it is not seriously considering the circumstances, his needs or requests. It has been over 30 days since the request was made to the warden on May 7, 2024, in any event. The exhaustion requirement is met.

The 18 U.S.C. 3553(a) factors weigh in favor of release. To state the obvious, Mr. Dalaly is a 72-year-old first-time, non-violent offender. His age and medical condition were not factors in the Court's original sentence, but things have changed – the BOP's delay in treating his medical problem has caused a situation where his physical and cognitive health have been irreparably damaged. Section 3553(a)(2)(D)'s requirement that the defendant's medical needs factor into sentencing weighs in favor of a sentence reduction and release so he can receive the necessary long-term medical care. He is in his seventh month of sentence.

Mr. Dalaly was extremely productive in the prison setting prior to his medical emergency and took advantage of what BOP could offer him, as well as humbly offering his own wisdom to other inmates. Seven months out of 28 months does not, on its face, seem like a significant portion of his sentence, but with ETC's under the

16

FSA and good time credits, he will have served "half" of his sentence by August/September anyway. He has a stable home environment with extremely supportive family members waiting for him upon his release. His family can see to his medical needs and care to put him in the best position for the best possible recovery after this life-altering, medical trauma he has endured. This entire experience with the illness has been a nightmare for Mr. Dalaly and his family, and the deterrent effects of the sentence already served significant enough to address the severity of the offense

      WHEREFORE, we ask the Court to exercise its discretion and reduce sentence to result in Mr. Dalaly's compassionate release.

                                                            Respectfully Submitted,

Dated: June 7, 2024                                          _s/ Britt M. Cobb_
                                                                 Britt M. Cobb (P69556)
                                                                 WILLEY & CHAMBERLAIN LLP
                                                                 300 Ottawa Avenue, N.W., Suite 810
                                                                 Grand Rapids, Michigan 49503
                                                                 (616) 458-2212
                                                                 bmc@willeychamberlain.com